CARL A. MILLER v. PETERSON CONSTRUCTION COMPANY AND OTHERS.
OSCAR O. OLSON AND ANOTHER, RELATORS.[1]

June 10, 1949.

No. 34,854.

[1]Reported in 38 N. W. (2d) 48.

*Maugridge S. Robb,* for relators.

*James Pomush,* for respondent Carl A. Miller.

*Shepley, Severson & Johnson,* for respondents Peterson Construction Company and Employers Mutual Liability Insurance Company.

MAGNEY, JUSTICE.

Certiorari to review an order of the industrial commission awarding compensation and medical benefits to respondent employe.

In the latter part of February 1947, Carl A. Miller commenced working for the Peterson Construction Company as a carpenter at wages of $66 per week. On March 5, 1947, while on a scaffold, he was assisting in placing a 16-foot plank, weighing 150 pounds, between two "I" beams. He testified that "when I reached over to set the plank in position I got the pain in my back." He said it was so severe he almost lost his balance. The pain was located in the lower end of the spine—the right sacroiliac center of the right buttock. Although his back pained him, he continued to work until March 10, when the pain became so severe he could not stand up. At 9:30 a.m. that day he quit and went home to bed. He thought he had the flu, and he told Al Blessner, his foreman, so. He did not tell Blessner or anyone else on the Peterson job that he had injured his back, just that his back hurt him. The next day he saw Dr. Anderson at Wayzata. He told Dr. Anderson that his back was bothering him and said that he thought he had "a cold" in it. No information was volunteered by Miller that he had injured his back while working for the Peterson company. Dr. Anderson did not ascertain what was the matter with him and gave him some pills. Miller stayed in bed at home until the 14th. On that day he went to the Peterson company and got his check. On March 17, he commenced working

for relator Oscar O. Olson, at the same kind of work, but lighter, and received the same rate of pay. About 9:30 a.m. of March 24, he was assisting another workman in raising a staging, weighing, according to his estimate, about 100 pounds. He was attempting to raise his arms over his head full length and pushing forward. Just as he gave a push, pain went clear down to his right foot. It was a severe pain such as he had never felt before. At the time it happened he told Richard Payton, his fellow worker, "I got a kink in my back." He told his foreman, Fred Beecher, that he had such a pain in his leg that he would have to quit and go home. He quit working immediately. During the time he was employed by Olson he was putting up a cornice, working on a 3-plank scaffold, which necessitated his climbing a 16-foot ladder about ten times a day. On March 26 he went to see Dr. Davis at Mound. He was given diathermic treatment and taped up. By the 28th the pain was so severe he could not walk. Dr. Davis referred him to Fairview Hospital, where Doctors Moe and Hall examined him. He remained in the hospital until April 10. On April 28 Doctors Hall and Moe told him to go back to work. He did so on May 2. He was given a brace to wear. In August he lost five days because of pain in his right leg, and at the time of the hearing on September 10 he still had some pain in the hip.

Miller told Dr. Davis that the pain in his back had cleared up after he stayed home the week after March 10. He also told Dr. Hall that after he had stayed home a week after March 10 the pain in the back had entirely cleared up. He did not tell Doctors Davis, Hall, or Moe about the sore spot in the right buttock. Thus, after March 24, he gave his attending physicians a history that he had completely recovered from the March 5 incident. At the hearing Miller admitted that he told his physicians that his back had cleared up and that in fact it had, but that he still had a sore spot in the hip.

On the history as Miller gave it to them, his physicians were of the opinion that the incident of March 24 caused a mild case of prolapsed disc. At the hearing, Miller claimed that when he commenced

to work for Olson the pain had left his back, but he still had a "sore spot in my hip." He described it: "It was a little sore * * *." "I still had a little ache in my hip." The incident of March 24 caused a severe pain to go clear down to his right foot. With the additional history given by Miller at the hearing, as to the pain in his hip as he described it continuing until he started to work for Olson, and assuming it to be true, Doctors Davis and Hall were of the opinion that the initial trauma to the disc occurred March 5 and that the condition created by the incident of March 24 aggravated the original condition. But even after hearing of the pain which Miller said he had on March 17 when he commenced to work for Olson, Dr. Davis stated that the March 24 incident was probably the cause of the disability, saying:

"* * * I felt that that is the time the disc prolapsed because of further reason that that was the first time to my knowledge that he had sought medical attention and that he had to stop work right then. The sudden onset, etc., was significant in my mind at that time."

Dr. Davis said, even assuming there had been some inciting incident on March 5, that on March 24 there was definitely a further protrusion which disabled him; that the further protrusion of the disc caused a further change in the physical structure of the body which was manifested by the pain extending down the leg to the foot. He said:

"* * * There must have been an aggravation in order to give him the increase in magnitude and severity of his symptoms."

He said that an important symptom of a prolapsed disc is the leg involved with the back trouble. "There is more likelihood," he said, "that two patients, both with pain in the back, one that develops leg symptoms of the nature described here would be more likely to have a disc than the one with just back pain."

Dr. Hall was of the opinion that Miller's initial onset of trouble began March 5; that apparently the March 24 incident was not enough to push the disc out completely, as Miller had shown re-

covery and was able to work; that therefore he never had a completely prolapsed disc where it actually ruptured through and could not get back. He said that if the occurrence of March 24 had not taken place, and admitting for the purpose of the question that he had had this other difficulty some three weeks before, there was no way of ascertaining how long Miller might have been able to continue and do the type of work he was doing. In his opinion, an aggravation took place March 24 of a preëxisting condition, assuming that Miller had the claimed injury on March 5 and that symptoms persisted as he claimed at the hearing. He was of the opinion that both incidents, if Miller should have any further trouble, would have to take some share of blame, basing this opinion on the history as given by Miller at the hearing and not from the history he gave Dr. Hall.

On these facts as quite fully outlined here, the industrial commission found that as a result of the incident of March 24, 1947, Miller was temporarily and totally disabled.

■ The question, then, is whether the facts support the finding under the rules we have adopted and stated numerous times. There is no need to restate them. A disputed fact exists as to the physical condition of Miller at the time he went to work for Olson. If the commission adopted the version that Miller had recovered from the effects of the March 5 incident at the time he commenced to work for Olson, which is the statement he gave physicians to whom he went for treatment shortly after March 24, then the decision is clearly correct. If the commission adopted the version which Miller gave at the hearing that when he went to work for Olson he still had a sore spot in his hip which he described as "a little sore"; that he still had a little ache in his hip, "not bad enough to stop me from working," but that for several days prior to March 24 he was able to climb a 16-foot ladder ten times a day in connection with his work, and that his claimed sore spot did not interfere with his work, and that suddenly while assisting in raising a staging he experienced severe pain which passed down his right leg to his foot, which immediately incapacitated him and which

continued to incapacitate him for some time, and which his physicians described as a mild prolapsed disc, the finding is supported to the extent required. In injuries of this kind, the cases must stand on their own peculiar facts. It may be desirable, but not possible, to lay down a formula which fits them all. In our opinion, the commission did not err in finding as it did.

In Schmoll v. J. W. Craig Co. 228 Minn. 429, 37 N. W. (2d) 539, the question involved was similar to the one in the instant case. We there restated the old rule that in determining whether the facts and reasonable inferences to be drawn from the facts sustain the findings of the industrial commission the evidence must be reviewed in the light most favorable to the findings.

■ The question of notice is also raised. When the March 24 incident took place, Miller told his foreman, Fred Beecher, that he had such a pain in his right leg that he could not step on it and that he would have to quit and go home. Beecher is the man to whom injuries would ordinarily be reported. He told Beecher that he had a pain in his leg and that it "got worse from raising the staging." He also told him about the March 5 incident. Beecher informed Olson that Miller had become disabled and had stopped work. After Miller came back to work in April, Olson's insurer, the Bituminous company, requested Olson to make an accident report, which he did. It was dated April 29, 1947, and received by the industrial commission on May 3, 1947. Item No. 6 of said report is as follows: "Location of place where accident occurred." It was filled in, "no accident." Item No. 7: "Date of Accident"; filled in "3/24/47." Item No. 17: "Describe fully how accident occurred." Olson complied as follows:

"On 3/24/47 Miller ceased work due to pain in back and leg. He then told me he had no accident on this day but that he had trouble with his back with Peterson Const. Co. as he had injured his back with them while lifting a heavy joist on Mpls.-Moline job in Hopkins."

Item No. 21 is a question: "Did injury cause loss of time?" It was answered "Yes." "From what date?" "3/24/47." And Item No. 22: "Has injured returned to work?" Answer, "No." This report was made out the day Miller asked to be put back on the job. At that time, according to Olson, he did not say anything about an injury in an accident. Olson testified:

"* * * It wasn't until two days later that I heard the pain had gone down into his foot, but I did not know that he had been lifting the staging until a long time after."

Miller, as stated, told Beecher, his foreman, at the time of the March 24 incident that his pain "got worse from raising the staging." Beecher testified that on March 24 Miller told him that his leg was getting so sore "he couldn't hardly walk on it" and he was afraid he would have to go home. He also testified that Miller told him he had not hurt his leg then.

The industrial commission found that Olson and his insurer had statutory notice of the accidental injury occurring to him on March 24, 1947. This finding is challenged by relator. He claims that the first notice or knowledge that Miller was claiming his disability to be compensable came to him on June 26 or 27, when the claim was filed, more than 90 days after the incident. The purpose of the notice to an employer or knowledge is to permit the employer to make such investigation as is necessary to determine his liability as to a claim. Olson himself, in his brief, makes the above statement, and it is correct. But he asserts that the only knowledge which he ever had was that Miller was suffering from a relapse of the very condition he disclosed at the time of his employment. From what we have already stated, Miller told Beecher, his foreman, at the time of the March 24 incident, that his leg "got worse from raising the staging." That would at least be notice of a claimed aggravation. Beecher knew at the time that Miller had to quit because of the extreme pain he suffered, which, as he was told, came on from lifting the staging. On April 29 Olson filled out the report of the accident, as has been stated, wherein he stated that some-

thing happened on March 24 which caused Miller to discontinue his work. He there said: "Miller ceased work due to pain in back and leg," but that Miller had told him that he had had no "accident" within the commonly accepted meaning of the word and as the average employe would understand it. At the time of the happening, the employer through his representative, the foreman, knew as much about the occurrence as Miller himself. Olson's notice to his insurer gave every opportunity for investigation, and no prejudice has resulted to the employer or the insurer. In our opinion, the industrial commission was right when it held that the statutory requirement as to knowledge or notice had been complied with.

Order affirmed and writ discharged.

